UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON

ROSS D. HAWLEY,

3:15-cv-146-JR

Plaintiff,

FINDINGS & RECOMMENDATION

v.

CLACKAMAS COUNTY CIRCUIT COURT,

Defendant.

RUSSO, Magistrate Judge:

Petitioner brings this proceeding pursuant to 28 U.S.C. § 2254 challenging his 2009

convictions for felony and misdemeanor assaults, coercion, criminal mistreatment, and harassment

in Clackamas County, Oregon. After a bench trial, the Clackamas County Court initially sentenced

petitioner to 80 months imprisonment which was upheld on direct appeal. Petitioner sought post-

conviction relief asserting, among other things, ineffective assistance of counsel for failing to object

to consecutive sentences for two counts which were part of the same criminal episode. The

Clackamas County Court resentenced petitioner to a 56 month term of imprisonment. Petitioner is

currently serving a term of post-prison supervision.

On January 28, 2015, pro se petitioner initiated the proceeding before this court, alleging five

grounds for relief. On February 27, 2015, the court appointed the Federal Defender to represent the

Page 1 - FINDINGS & RECOMMENDATION

petitioner. On October 9, 2015, petitioner submitted an amended petition, through counsel, asserting

four grounds for relief:

1.      The trial court violated Petitioner's constitutional rights, guaranteed by the
Fourteenth Amendment to the United States Constitution, when it denied the motion
for judgment of acquittal because there was insufficient evidence to establish all of
the necessary elements of Counts 7 and 8, Criminal Mistreatment and Assault IV.

2.      Petitioner was denied due process of law as guaranteed by the Fourteenth
Amendment to the United States Constitution when the prosecutor made improper
statements during closing argument.

3.      Petitioner was denied the effective assistance of counsel as guaranteed by the
Sixth and Fourteenth Amendments to the United States Constitution when trial
counsel failed to object to improper statements made by the prosecutor during closing
argument.

4.      Petitioner was denied the effective assistance of appellate counsel as
guaranteed by the Sixth and Fourteenth Amendments to the United States
Constitution when appellate counsel failed to assign as error on appeal the
prosecutor's improper statements during closing argument.

Amended Petition (#22) at pp. 3-4.

On December 11, 2015, petitioner submitted a brief in support of his petition arguing only

grounds one and three. To the extent petitioner has not briefed the other grounds for relief raised in

the petition, those grounds should be deemed waived. Cf. Yohey v. Collins, 985 F.2d 222, 224-225

(5th Cir.1993) (requiring that arguments must be briefed to be preserved); Davis v. Woodford, 384

F.3d 628, 638 (9th Cir. 2003) ("Petitioner carries the burden of proving by a preponderance of the

evidence that he is entitled to habeas relief.").

Pursuant to the Anti-terrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub.L.

No. 104–132, § 104, 110 Stat. 1214, 1219 (1996), under section 2254, habeas relief may only be

granted

in cases where the state-court decision "was based on an unreasonable determination
of the facts in light of the evidence presented in the State court proceeding." Or, to

put it conversely, a federal court may not second-guess a state court's fact-finding process unless, after review of the state-court record, it determines that the state court was not merely wrong, but actually unreasonable. Cf. Lockyer v. Andrade, 538 U.S. 63, 75, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003) ("The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous. The state court's application of clearly established law must be objectively unreasonable."); see also Torres v. Prunty, 223 F.3d 1103, 1107–08 (9th Cir. 2000) (same standard of unreasonableness applies under subsections (d)(1) and (d)(2)). Second, section 2254(e)(1) provides that "a determination of a factual issue made by a State court shall be presumed to be correct," and that this presumption of correctness may be rebutted only by "clear and convincing evidence."

Taylor v. Maddox, 366 F.3d 992, 999 (9th Cir. 2004).

In addition, relief may be granted where the state court's decision is contrary to or an unreasonable application of clearly established federal law as determined by the United States Supreme Court. 28 U.S.C. § 2254(d)(1).[1] The burden is on petitioner to demonstrate unreasonableness even absent a state court's explanation of its decision. See Harrington v. Richter, 131 S.Ct. 770, 784 (2011).

Petitioner concedes he failed to present his third ground for relief to the state court for consideration which generally precludes federal habeas review. See 28 U.S.C. § 2254(b)(1) (habeas shall not be granted unless the applicant has exhausted state court remedies); Duncan v. Henry, 513 U.S. 364 (1995) (habeas petitioners must "fairly presen[t] federal claims to the state courts in order to give the State the opportunity to pass upon and to correct alleged violations of its prisoners' federal rights."). However, in Oregon, the first time a petitioner may raise an ineffective assistance of trial or appellate counsel claim is in a post-conviction proceeding. Although there is no right to counsel

---

[1]To be contrary to federal law, the decision must contradict the governing law set forth in Supreme Court precedent, or provide a different result to an indistinguishable fact pattern. Williams v. Taylor, 529 U.S. 362, 405-06, 413 (2000). To be an unreasonable application, the state court, although identifying the correct governing legal principle, must unreasonably apply the legal principle to the facts of the petitioner's case. Id. at 413.

in a post-conviction proceeding, inadequate assistance of counsel at an initial review collateral proceeding may establish cause for a petitioner's procedural default of an ineffective assistance of counsel claim. See Martinez v. Ryan, 132 S.Ct. 1309, 1315, 1320 (2012) ("Where, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective."). "To overcome the default, a [petitioner] must also demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the [petitioner] must demonstrate that the claim has some merit." Id. at 1318. Petitioner asserts post-conviction counsel was ineffective due to failure to raise the ineffectiveness of trial counsel. Thus, whether post-conviction counsel was ineffective for failing to raise the claim involves a review of the merits of the alleged underlying ineffective assistance of trial counsel claim. Accordingly, the court should review the merits of the claim rather than denying it as procedurally defaulted.

The charges against petitioner stem from conduct toward his wife, Amy Hawley, and son, R, from late 2007 through June 2009, while all three lived together in a West Linn, Oregon apartment. On June 6, 2009, Amy Hawley's mother called police to conduct a welfare check on her daughter and grandchild. The responding officers were concerned about domestic abuse and, after questioning Amy and R, arrested petitioner.

Subsequent investigation resulted in charges of assault, kidnaping, coercion, mistreatment, harassment, and menacing arising out of incidents on December 2, 2007, May 1, 2008, September 1, 2008, May 15, 2009, May 16, 2009, and June 6, 2009.   The May 15, 2009 incident and subsequent conviction for fourth degree assault and criminal mistreatment of R is at the heart of

Page 4 - FINDINGS & RECOMMENDATION

petitioner's ground one claim.

## A.   Ground One

Petitioner asserts there was no factual basis to convict him on the fourth degree assault and first degree criminal mistreatment counts. Thus, petitioner argues his right to due process was violated and his convictions on these counts should be vacated. See Jackson v. Virginia, 443 U.S. 307, 324 (1979) (petitioner is entitled to habeas corpus relief if it is found on the record that evidence adduced at trial did not support proof of guilt beyond a reasonable doubt). In resolving a Jackson claim, the evidence must be viewed in a light most favorable to the prosecution. Id. at 319  This question must be resolved using applicable Oregon law to define the elements of the crime. See id. at 324.

To obtain a conviction for either fourth degree assault or first degree criminal mistreatment, the State must prove the element of physical injury beyond a reasonable doubt. See O.R.S. § 163.205 (mistreatment requires intentionally or knowing causing physical injury); O.R.S. § 163.160 (assault requires  intentionally, knowingly, or recklessly causing physical injury).[2]

"Physical injury" means impairment of physical condition or substantial pain. O.R.S. § 161.015(7). Respondent argues there is sufficient evidence in the record to establish substantial pain

_____

[2]Respondent argues the interpretation of "physical injury" is a state law matter that is not reviewable by this court. See Peltier v. Wright, 15 F.3d 860, 862 (9th Cir. 1994) (state courts are the ultimate expositors of state law, and federal courts are bound by the state's construction except when it appears that its interpretation is an obvious subterfuge to evade the consideration of a federal issue). However, petitioner's claim does not seek to have this court interpret the statute, but merely determine the sufficiency of the evidence in meeting the state's interpretation of "physical injury." See Goldyn v. Hayes, 444 F.3d 1062, 1070 (9th Cir. 2006) (state has wide latitude in defining and interpreting elements of state crimes, but every element must be proven beyond a reasonable doubt and thus state is not free to ignore an element or define it out of existence).

with respect to petitioner's conduct against R on May 15, 2009.

The term "substantial pain" refers to the degree and duration of pain suffered by the victim. To be substantial, pain must be "ample," State ex rel Juv. Dept. v. Salmon, 83 Or.App. 238, 241 n. 2 (1986), or "considerable," State v. Capwell, 52 Or.App. 43, 46 (1981). Pain that is fleeting or inconsequential is not substantial. State v. Pool, 175 Or.App. 258, 261 (2001).

The evidence regarding the alleged May 15, 2009, mistreatment and assault of R primarily came from Amy Hawley, R, West Linn police officer Jason Dolan, and West Linn police officer Daniel Poitras, Jr.

R, who was seven years old when he testified, remembered very little of the events of May 15, 2009. He recalled being slapped once on the leg and reported that it did not hurt much. In addition, he did not remember whether petitioner was angry with Amy Hawley, but instead reported that petitioner (R's father) said "mostly nice things to her." See Ex. 104 (#39-2) at pp. 105, 111-13. Cross-examination similarly revealed R's inability to recall the incident. See id. at p. 113-114.

Amy Hawley acknowledges she drinks about 10 alcohol drinks per day and the evidence is conflicting as to whether she was usually drunk or functioning well despite the drinking. See id. at p. 42 ("drinks everyday but it's a maintenance thing"); p. 86-87 (drinks more than 10 drinks per day); 217-18 (A friend of petitioner testifies "most times he saw Amy Hawley she was intoxicated, but it was hard to tell because she is clumsy while other times it was obvious"). Id. at pp.217-18.

With respect to the incident on May 15, 2009, Amy Hawley testified that she had consumed two beers. Id. at p. 53.[3] She also testified that when petitioner arrived home that day, he was very angry, yelling obscenities and calling her names. She stated that R asked him what's wrong? She

---

[3] Officer Poitras testified that Amy Hawley did not appear to be intoxicated on June 6, 2009, when he responded to the domestic disturbance call. Ex. 104 (#39-2) at p. 173.

further testified that petitioner tried to tip over the coffee table, breaking it and shattering glass. Id. at p. 54. She stated that petitioner called her a "slut," "bitch," and "whore" with R in the room. Id. at p. 55. She then sent R to his room, however he refused to remain in his room and instead continued to stay near his parents. Id.

Amy Hawley next testified that petitioner hit her 10 times with an open hand and forced her to sit in a chair. Id. at pp. 57-58. She states that R was in the room at times when petitioner hit her and that R was very upset, crying, and telling petitioner to stop. Id. at p. 58. She stated that as a result of the blows, lasting for an hour, she suffered facial bruising and a black eye. Id. at p. 59. She also testified petitioner grabbed her and pushed her down causing bruising to her legs and hip. Id. at p. 61.

Amy Hawley testified to the petitioner's interaction with R on May 15, 2009 as follows:

Q.     At some point in time during the sequence of events did he, meaning Mr. Hawley, did Mr. Hawley go back into the bedroom to deal with [R]?

A.     Yes.

Q.     Where were you when he went back into the bedroom?

A.     In the chair in the living room.

Q.     Okay. And was that the chair that he told you, you had to stay in?

A.     Yes.

Q.     Okay. When he went back in the bedroom how long was he in there?

A.     For a few minutes.

Q.     Okay. And what if any -- You didn't see anything, is that fair?

A.     No, it was just what I heard.

Q.     Okay. And what if anything did you hear going on in the bedroom?

Page 7 - FINDINGS & RECOMMENDATION

A.      He got upset with [R], and he went into the bedroom to scold him, and he cornered him in his -- on his bed, and I heard him hitting him --

Q.      Okay.

A       -- telling him to be quiet, and he was his father and not me, and he (audio-recording inaudible).

Q.      Do you know why Mr. Hawley was mad at R?

A.      Because to put it simply he was taking my side over his.

Q.      Oh. In other words, [R], was supporting you and not supporting him?

A.      Yes, ma'am.

Q.      What things if any did you hear Mr. Hawley say to [R] in the bedroom?
A.      "Be quiet. She's -- She's just your mother, she's nothing but a," this and that, and, "She's going to die soon anyway, and you need to obey me. I'm your father and you need to listen to me, and she can't help you."

Q.      Was he saying those things to him in a conversational voice, or was he raising his voice?

A.      No, he was screaming.

Q.      He was screaming?

A.      Oh, yes.

Q.      And then you say that you heard sounds like [R] was being hit?

A.      He was -- He was screaming, "Ouch, stop."

Q.      Okay. What -- Did it sound like a slap would sound?

A.      Yeah.

Q.      What did it sound like?

A.      It sounded like he had -- It was like that, like that but hard. Hard enough to hear in the other room.

Q.      Okay. How far away was the bedroom from the living room?

Page 8 - FINDINGS & RECOMMENDATION

A.    Oh, it's not very far. It's, you know, around corners. It's probably only about six feet, if you want to get technical.

Q.    Okay. Did you have any difficulty hearing the slapping --

A.    No.

Q.    -- sounds that you've described?

A.    No.

Q.    How many slapping sounds do you think you heard?

A.    I think I counted five. That was before. I mean I had got up. I got up out of the chair and ran into the bedroom at that point.

Q.    What did you see when you ran into the bedroom?

A.    He was standing over him but he wasn't hitting him anymore.

Q.    Okay.

A.    He was standing directly over him.

Q.    Okay. Where was [R] when you saw him?

A.    In the corner -- corner of the closet, walk-in closet on his bed holding his head crying.

....

Q.    When you came in the room what did Mr. Hawley do?

A.    He turned around and blocked me from going back in the bedroom, and pushed me down, and I got up. I don't know how I got around him, honestly. I went and sat in front of my son on the bed.

Q.    Why did you do that?

A.    In case he went to hit him again he would hit me first instead.

Q.    Okay. And did Mr. Hawley strike you when you were in between --

A.    Yes.

Q.    -- you and [R]?

Page 9 - FINDINGS & RECOMMENDATION

A.   Yeah.

Q.   How many times did he hit you?

A.   I don't know.

~Q.   Was it more than once?

A.   It was more than once. It was more -- more, just a lot of yelling and like pushing on us, and pushing on me to I was just trying to block my son.

Q.   Okay. What types of things was he saying to you at this point, Mr. Hawley, what was he saying to you?

A.   Just the same -- the same, you know, insults and stuff he'd been saying from the start, and that, you know, I'm not a good mother, and I can't take care of my son, and I'm going to die soon anyway, you know.

Id. at pp. 63-67.

Officer Dolan talked to R on June 6, 2009, and testified that R told him that petitioner hit him in his chest and face when his mom said something to make his dad mad. Id. at pp. 137-38. Officer Dolan also said R told him "it didn't really hurt because [he] was tough." Id. at p. 138.

Officer Poitras also interviewed R on June 6, 2009, and noticed pink marks on R's chest that resembled faded bruises. Id. at p. 155. Officer Poitras testified R told him petitioner "only pushes him in the chest," he sees his parents fight, and his mother told him not tell his classmates petitioner hits them. Id. at p. 156.

If a trier of fact were to consider only R's testimony coupled with the officers' recollection of what R told them two weeks after the event, it might not be reasonable to conclude that R suffered substantial pain.[4] See State v. Rennells, 253 Or.App. 580, 587 (2012) (no substantial pain where victim testifies she was not hurt as a result of being kicked by defendant); State v. Anderson, 221

---

[4]Respondent does not argue that the conduct of petitioner caused R impairment of physical condition.

Or.App. 193, 194 (2008) (evidence of defendant breaking a car window causing glass to shatter resulting in two tiny cuts to a two year old child who said "owie" insufficient to establish substantial pain).

However, in light of Amy Hawley's testimony, a trier of fact could conclude that R, a seven year old child, may have been trying to put on a brave face and/or was unable to recall the pain inflicted during a traumatic event. R's testimony reflected he did not remember being hit, but did remember a slap on the leg. He also did not remember petitioner being angry and stated petitioner mostly said nice things to his mother. In contrast, Amy Hawley testified petitioner slapped R five times so hard she could hear it in another room. She stated R screamed "ouch, stop" and cried while holding his head. Hawley further testified the slaps left a red hand print on the side of R's face that lasted until the following afternoon. Ex. 104 (#39-2) at p. 77.

Petitioner's trial counsel moved for judgment of acquittal on the charges of assault and mistreatment against R arguing the testimony of Amy Hawley was insufficient to establish the elements of the charges. Id. at pp. 204-05. The court denied the motion and, after hearing the defense's case, found petitioner guilty of the charges. Id. at p. 212, 330. On appeal, citing the due process clause, the petitioner argued the court erred in denying the motion for judgment of acquittal. The court of appeals affirmed without opinion. Ex. 108 (#39-4) at pp. 16-18, Ex. 112 (#39-4) at p. 1.

While other fact-finders may disagree that substantial pain was established beyond a reasonable doubt, it cannot be said the state courts' decisions were an unreasonable application of law or determination of facts. In State v. Pool, the Oregon Court of Appeals discussed the element of substantial pain for purposes of assault:

We have never held that pain unaccompanied by bruising or pain that does not

Page 11 - FINDINGS & RECOMMENDATION

require medical attention cannot, as a matter of law, be "substantial." We have found previously that a headache that lasted an hour constituted substantial pain. State ex rel Juv. Dept. v. Greenwood, 107 Or.App. 678, 682, 813 P.2d 58 (1991). In this case, the state's evidence, if believed, was sufficient to prove that Holthausen's pain was of substantial duration-it lasted 24 hours-and that it was of substantial degree-it was first sharp, then throbbing. Because the evidence sufficed to create a jury issue as to whether Holthausen suffered a physical injury, the trial court did not err in denying defendant's motions for judgment of acquittal.

175 Or.App. 258, 261 (2001). In Pool, the victim testified the kick caused pain that was a three or four on a scale of one to 10; a sharp pain lasting about an hour.

As noted above, R appears not to remember the incident or any pain from the incident. However, in State v. Guzman, the court noted that in many substantial pain cases, the victim did not testify about the pain or provide direct evidence as to the severity or duration of the pain. 276 Or. App. 208, 213 (2016). Nevertheless, the evidence allowed a trier of fact to make reasonable inferences about the pain element. Id. at 213-15. Despite the absence of victim testimony, the evidence, including photographs of the injuries and witness testimony from which a rational juror could infer facial swelling immediately after the altercation that turned into significant bruising and soreness that persisted for a consequential amount of time, was sufficient to create a jury question as to whether the victim suffered substantial pain. Id. at 215-16 (2016).

Here, a rational trier of fact could conclude that five hard slaps, followed by screams of "ouch, stop," along with a red hand print lasting a day coupled with the observation of the victim crying while holding his head demonstrate substantial pain. Accordingly, viewed in a light most favorable to the prosecution, the evidence provides a factual basis upon which a rational trier of fact could conclude that all elements of the crimes were established beyond a reasonable doubt. Thus, petitioner's due process rights were not violated and the court should deny petitioner's first ground for relief.

Page 12 - FINDINGS & RECOMMENDATION

B.      Ground Three

 Petitioner asserts he was denied effective assistance of counsel when trial counsel failed to object to improper statements made by the prosecutor during closing argument.

 To prevail on a claim of ineffective assistance of counsel, petitioner must show his attorney's performance fell below an objective standard of reasonableness and that performance prejudiced his defense. Strickland v. Washington, 466 U.S. 668, 687 (1984). Chacon v. Wood, 36 F.3d 1459, 1463 (9th Cir. 1994).

 There is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance, or what "might be considered sound trial strategy." Strickland, 466 U.S. at 689.  Reasonableness is judged at the time of counsel's conduct, not in hindsight. Id. at 689-90. Petitioner must identify counsel's acts or omissions that are alleged to fall outside of reasonable professional judgment.  The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance.  To satisfy the prejudice component, petitioner must also show there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. Strickland, 466 U.S. at 694.

 Petitioner highlights the following statements from the prosecutor:

[T]his case I think exemplifies, and at times and everybody in this courtroom has been doing it longer than I have, but as it relates to domestic violence cases I have been doing it for awhile [sic], and, you know, we've had people tell us about people, I mean people that I respect, judges and people of that nature.

We've had statements made like, and I'm not faulting anybody, but I don't understand why we waste taxpayer's money and resources on these type of cases, and, you know, if it were up to me this is the case if not cases that we see that everyone says why is it so important?

Mr. Hawley is -- Well, controlling, abusive. His conduct in the courtroom today was

Page 13 - FINDINGS & RECOMMENDATION

absolutely without question outrageous, and to be honest, I feel a little guilty myself about how ends [sic] up I got with him, but he was frustrating. He was completely lying through his teeth.

\* \* \*

[characterizing Mr. Hawley's testimony as claiming everyone else who testified had lied]

\* \* \*

Anyway, I could go on and on about his testimony, and to be honest I could go on and on about every single person the defense called as witnesses in this case. It never ceases to amaze me how people can take oaths to tell the truth and come in and decide that they would rather protect the defendant than be honest and forthcoming and hopefully get to whatever result the Court is going to come to.

Amy Hawley has baggage. You know what? She's an alcoholic. She owns it, she doesn't make any excuses for it. I don't think she minimized it once, and just because she's an alcoholic doesn't mean she can't be a victim of a domestic violence, and by saying victim of domestic violence I don't mean that she is weak. I don't mean that she -- the onus was on her to do anything.

She was getting by day by day doing what she needed to do, and, yeah, you know what? She self-medicated a whole lot, and we can all sit here and we can all say, well, you know what? Arm chair quarterback, if it happened to me the first time that I got hit, the first time that I got controlled, the first time that I got punched I'm out of here.

Well, guess what? It doesn't work that way, and the reason it doesn't work that way is because she had a little kid with Mr. Hawley, and the last thing in the world that she wanted was to try to figure out what it was going to be like when Mr. Hawley had an access to her son without her present. So you know what? She put up with a lot of beatings and a lot of abuse and a lot of bruises because she was a good mom.

I am confident, very confident that in certain respects that the system, you know, the big system, we in the big picture have failed Amy Hawley and Ross, Jr., and we can sit here and say - and we can sit here and blame Amy Hawley, and we can say, well, you know what? She didn't want our help, and that's easy, but I am confident that if West Linn Police Department had not spent time with her that night, and Officer Poitras had not been willing to spend a [sic] hour and a half with her that it took, and if he had been like other deputies who had responded and yet didn't have the attitude that, you know what? If she doesn't want to help herself I ain't going to help her either, and had spent five minutes with her and done the welfare check and seen all the bruises and said, hey, if you -- if you want to go back to him go right ahead. That

could have been what happened in this case, judge, and Amy Hawley would still be with Mr. Hawley I am convinced.

Thank goodness that the West Linn Police Department stepped up and they did what they did. They should be commended for it.

Thank goodness, and I'm not patting myself on the back, I'm patting members of my office on the back, thank goodness that we have a victim's advocate who knows exactly what she's doing, who maintained contact with this victim, who reached out, who made her feel like she was protected.

Thank God we had people like Tina Kramer who spent time talking to her and reassuring her and alleviating her fears, because the only reason that Amy Hawley came in here and testified the way that she did is because she felt safe, and that's because for once he's remained behind bars, and I guess what I'm asking, judge, at this point is we all have our part to do.

I think the police department had their part. I think the advocates had their part. I think our investigators had their part.

I had my part, and, quite frankly, my part is easy. I get to ask people questions and whatnot, and I think -- and I'm not -- I don't want this to sound like a challenge, because I don't mean it that way, but I think you have your part too, judge, and I think your part is to apply the law, apply it appropriately. I am confident that you will do that.

The last thing that I want to say, and it's by way of an analogy, and I've used it once before, I'm going to use it once again. I -- I just think it illustrates at least for me how we can look at these cases.

A couple of years ago my mom, my grandma, and my brother, who is in a wheelchair because he has cerebral palsy, went up to Seattle, because my brother had some speech thing that he did. On the way back they stop at Pike Street Market in Seattle, because I think my grandma, I'm not sure, it's either my mom or my grandma just had to have some -- some of those big bouquets from the Pike Street Market, and my mom got -- who is driving the car, because my brother can't drive a car, my mom parks the car. My brother doesn't want to get out for the five minutes that it's going to take to get out of car, he wants to listen to the radio. My mom leaves the keys in the ignition and her and my grandma walk out of the car and they go to get some flowers, and were going to go and then race back to the car, and obviously the door of the car's unlocked. So some yahoo climbs into the van and takes off with my brother in the car, and my mom sees -- you know, she's kind of seen the taillights. She's walking back and the car's not there, and she's seeing the taillights take off, and she's running after the car. Amber Alert goes off. Thank goodness that some good samaritan who I've met followed it, you know, heard the amber alert, saw the

Page 15 - FINDINGS & RECOMMENDATION

car, followed it, took it -- I don't know how long it took, I think like -- frankly, the time period's getting a little bit longer as the years go by, but in any event the end of the story is that everything was okay.

So the analogy is the way I look at it, judge, is we can sit here and we can blame my mom for leaving the keys in the car, or we can -- I guess what I mean is we can blame Amy Hawley because she didn't leave, and we can blame her until we're blue in the face, because you know what? At any point in time she could have left this man. I'm not willing to do that. I don't think it was my mom's fault, I think the criminal that got into the car and took off with my brother is the one that's at fault, and so we can ask why didn't she just leave? And that's fine, but I think once we shift the burden from the criminal to the victim we lose, and I think the blaming of Amy Hawley has to stop.

I'm not suggesting that this Court has, but Mr. Hawley, his witnesses, his stepmother, you name it, everybody blames Amy Hawley. Amy Hawley did not get the bruises on her body because she's a drunk and because she's stumbled into the walls. She got the bruises because she was beat over and over and over again.

So I'm simply asking the Court to lay the blame where it is appropriate so that Mr. Hawley at some point will recognize that his conduct is not appropriate. Thank you.

Brief in Support (#27) at pp. 7-10 (quoting Ex. 104 (#39-3) at pp. 312-317).

Petitioner also highlights the prosecutor's rebuttal:

You know, judge, I mean point proven, but I mean I understand Ms. Meaney's doing her job. I get it. Mr. Hawley's nodding his head up and down the whole time. Every time there's something bad to say about Amy Hawley, you know, the whole time we're banging again on Amy Hawley, and, yeah, you know what? You can't – Maybe we should, but you know what? We're not robots, and I'm not a robot, and we can't act like that. We're talking about families, we're talking about kids, we're talking about protecting kids, we're talking about maybe having Ross, Jr., not grow up to be like his dad. I mean that's really what we're talking about, and if you can't get worked up about that I don't know what you can get worked up about. So I apologize if – and I know I did. I apologize for getting frustrated, I simply wanted him to answer questions. He wasn't doing it, and, like I said, I – I am done with the bagging on Amy Hawley. She doesn't deserve it, it's not warranted, and I simply want the Court – Obviously we've got a motion [sic] at this point without sympathy, without prejudice, without any of it to rule appropriately as it relates to the state's burden of proof.

Id. at p. 11 (quoting Ex. 104 (#39-3) at p. 326).

Petitioner argues the prosecutor's remarks during closing were improper and prejudicial in

Page 16 - FINDINGS & RECOMMENDATION

that they vouched for the State's witnesses while disparaging defense witnesses, urged conviction

on irrelevant grounds, and repeatedly urged the fact-finder to decide the case based on policy reasons

rather than the evidence presented in the case.

The prosecutor's closing argument did contain some objectionable statements.  See, e.g.,

United States v. Nobari, 574 F.3d 1065, 1076 (9th Cir. 2009) (prosecutor may not improperly

inflame passions, fears, and vulnerabilities); United States v. Molina, 934 F.2d 1440, 1444 (9th Cir.

1991) ("As a general rule, a prosecutor may not express his opinion of the defendant's guilt or his

belief in the credibility of government witnesses.");  Baldwin v. Adams, 899 F.Supp.2d 889, 915

(N.D.Cal. 2012) (improper for the prosecutor to argue facts not in evidence).  However, the case was

tried to a judge and not a jury as defense counsel noted:

> Your Honor, if this were a jury trial I probably would have been jumping up and
> objecting at some point through Ms. Kmetic's argument. She obviously is taking
> things very personally and made very personal observations that were not related to
> -- to the evidence, that I've been around long enough to know that the Court knows
> what to listen to and whatnot.

Ex. 104 (#39-3) at p. 317-18.

Even assuming some of the prosecutor's statements were improper, in order to violate due

process the statements must so infect the trial as to deny petitioner a fair trial.  Darden v. Wainright,

477 U.S. 168, 180-81 (1986).  Here, the defense, while not objecting to the statements, did highlight

for the judge the personal nature of the prosecutor's closing argument.  Moreover, because this was

a bench trial, it is presumed the trial court disregarded inadmissable evidence.  Cf., State v. Fulmer,

229 Or.App. 386, 395 (2009) ("When a case is tried to the court, appellate courts presume, unless

the record demonstrates otherwise, that the trial court disregarded any inadmissible evidence and

based its findings and judgment only on admissible evidence.");  United States Chagger, 197

Fed.Appx. 704, 706 (9th Cir. 2006) (improper vouching harmless at a bench trial conducted by an

Page 17 - FINDINGS & RECOMMENDATION

experienced judge).

Although petitioner argues the judge seemed to echo the prosecutor's observations regarding credibility, he was the finder of fact charged with determining credibility and did so based on witness testimony. <u>See</u> Ex. 104 (#39-3) at p. 328 (notes prosecutor "nailed it" regarding petitioner's controlling conduct on the stand and draws inference that it was the same kind of controlling conduct testified to by Amy Hawley).

Petitioner's trial counsel was not deficient. Trial counsel noted the prosecutor's objectionable comments, but made the strategic decision not to object due to the fact it was a bench trial. Waiting to note the impropriety until her own closing argument falls within the wide range of reasonable professional assistance, or what might be considered sound trial strategy. Because trial counsel engaged in a reasonable trial strategy, post-conviction counsel did not provide ineffective assistance by failing to raise this insubstantial claim. Thus, the procedural default of this ground should not be excused. The court should deny petitioner's third ground for relief and deny habeas relief.

## CONCLUSION

The petition for relief pursuant to 28 U.S.C. § 2254 should be denied.

This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the district court's judgment or appealable order. The parties shall have fourteen (14) days from the date of service of a copy of this recommendation within which to file specific written objections with the court. Thereafter, the parties shall have fourteen (14) days within which to file a response to the objections. Failure to timely file objections to any factual determination of the Magistrate Judge will be considered as a waiver of a party's right

Page 18 - FINDINGS & RECOMMENDATION

to de novo consideration of the factual issues and will constitute a waiver of a party's right to appellate review of the findings of fact in an order or judgment entered pursuant to this recommendation.

## CERTIFICATE OF APPEALABILITY

Should the district court adopt this recommendation, the court should further certify that the petitioner has not made a substantial showing of the denial of a constitutional right pursuant to 28 U.S.C. § 2253(c)(2) and that this cause is not appropriate for appellate review.

DATED this 15th day of September 2016.

Jolie A. Russo

JOLIE A. RUSSO
United States Magistrate Judge

Page 19 - FINDINGS & RECOMMENDATION